**GLOBALSANTAFE CORPORATION,** Plaintiff,

v.

**GLOBALSANTAFE.COM, Defendant.**

No. CIV.A.01–1541–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Feb. 5, 2003.

Kevin Michael Henry, Sidley Austin Brown & Wood, Washington, D.C., for Plaintiffs.

## MEMORANDUM OPINION

ELLIS, District Judge.

GlobalSantaFe Corporation ("GlobalSantaFe"), the plaintiff in this *in rem* suit under the Anticybersquatting Consumer Protection Act ("ACPA"),[1] successfully demonstrated that the domain name <globalsantafe.com> infringes its trademark and accordingly obtained a Judgment Order directing Hangang Systems, Inc. ("Hangang"), the registrar of the infringing domain name, to transfer the name to GlobalSantaFe.[2] Yet, because a Korean

court enjoined Hangang from transferring the domain name, GlobalSantaFe now seeks a further amendment of the Judgment Order directing the ".com" registry, VeriSign Global Registry Services ("VeriSign"), to cancel the domain name. Thus, the question presented here is whether the ".com" registry in the United States may be ordered to cancel a domain name that has already been found to be registered in violation of the ACPA, where, as here, the foreign registrant has obtained an injunction from a foreign court barring the foreign registrar from transferring the domain name.

## I.

The facts are straightforward.[3] Prior to their merger, Global Marine Inc. ("Global Marine") and Santa Fe International Corporation ("Santa Fe") were both involved in the business of contract drilling and related services. Global Marine was a major international offshore drilling contractor, and the world's largest provider of drilling management services, while Santa Fe was a leading international offshore and land contract driller and also provided drilling-related services to the petroleum industry. Since 1958, Global Marine had conducted business under its GLOBAL MARINE mark and in 1969 Global Marine was issued a federal trademark for the mark. While Santa Fe's mark was not registered, the company had used its SANTA FE mark in conducting and promoting its services since 1946, and customers and others came to associate the mark with Santa Fe's services.

---

1. 15 U.S.C. § 1125(d)(2)

2. *See GlobalSantaFe Corp. v. GlobalSantaFe.com*, Civil Action No. 01–1541–A (E.D. Va. April 1, 2002) (Amended Judgment Order).

3. The facts are drawn from the complaint. Upon default, facts alleged in the complaint are deemed admitted and the appropriate inquiry is whether the facts as alleged state a claim. *See Anderson v. Foundation for Advancement, Educ. and Employment of Indians*, 1999 WL 598860 (4th Cir. Aug. 10, 1999); *Bonilla v. Trebol Motors Corp.*, 150 F.3d 77, 80 (1st Cir.1998).

On September 3, 2001, Global Marine and Santa Fe publicly announced their agreement to merge into an entity to be known as GlobalSantaFe Corporation. Less than one day later, Jongsun Park registered the domain name <globalsantafe.com> with the Korean registrar Hangang.[4] The domain name was subsequently transferred to Fanmore Corporation, a Korean entity, with Jong Ha Park ("Park") listed as the administrative, billing and technical contact. The web site currently linked to the domain name is simply a placeholder site marked "under construction." [5]

On October 5, 2001, just over one month after the announcement and Jongsun Park's registration of the <globalsantafe.com> domain name, Global Marine and Santa Fe filed this ACPA *in rem* action against the domain name. Service was perfected as required under the ACPA by sending notice of the alleged violation and the pending *in rem* action to the postal and email addresses of the listed registrant and by publishing notice of the action in two Korean newspapers. *See* 15 U.S.C. § 1125(d)(2)(A)(ii)(aa) & (bb).[6] In the meantime, on November 20, 2001, the merger of the two compaines became effective, resulting in the publicly traded GlobalSantaFe company with a market value of approximately $6 billion. On November 15, 2001, GlobalSantaFe applied for a federal trademark registration for

the GLOBALSANTAFE mark under four separate categories, and those applications are pending. On December 20, 2001 the registrar, Hangang, deposited the registrar certificate for the domain name with the Clerk of this Court, and by doing so "tender[ed] to the Court complete control and authority over the registration" for <globalsantafe.com>, as required by the ACPA, 15 U.S.C. § 1125(d)(2)(D)(i)(I). The registrant failed to appear, either in person or through pleadings, to defend its right to use the domain name.

In response to the registrant's apparent default, the matter was referred to a magistrate judge for proposed findings of fact and recommendations pursuant to 28 U.S.C. § 636(b)(1)(B). The magistrate judge's Report and Recommendation concluded that the registration of the domain name violated the ACPA and that the registrant acted in bad faith,[7] and recommended that the domain name be transferred to GlobalSantaFe. Following consideration of the Report and on the basis of an independent review of the entire record, this Court adopted the Report's findings of fact and recommendations as its own, entered judgment by default in favor of GlobalSantaFe, and ordered VeriSign to transfer the domain name <globalsantafe.com> to GlobalSantaFe.[8] Shortly after this Judgment Order entered, GlobalSantaFe sought an amend-

---

**4.** The domain name was registered on September 4, 2001 in Korea. Yet, because of the time zone difference, at the time the merger was announced on September 3 it was already September 4 in Korea.

**5.** The site previously included a picture of a Hyundai Santa Fe sports utility vehicle, but that picture has been removed.

**6.** *See GlobalSantaFe Corp. v. GlobalSantaFe.com*, Civil Action No. 01–1541–A (E.D.Va. October 23, 2001) (Publication Order).

**7.** The Fourth Circuit has subsequently held that a plaintiff may prevail in an *in rem* trademark infringement action without alleging and proving bad faith. *See Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 228 (4th Cir.2002).

**8.** *See GlobalSantaFe Corp. v. GlobalSantaFe.com*, Civil Action No. 01–1541–A (E.D.Va. March 25, 2002) (Judgment Order)

ment to add Hangang, the registrar, as the entity ordered to transfer the domain name.[9] On April 1, 2002, an Amended Judgment Order was entered, directing both Hangang and Verisign to "take all appropriate steps to transfer the domain name" to GlobalSantaFe.[10]

On April 9, 2002, Park filed an application for an injunction in the District Court of Seoul, Korea, requesting that court to issue an injunction prohibiting Hangang from transferring the domain name as ordered by this Court. The District Court of Seoul provisionally granted this injunction by order dated September 17, 2002, finding that this Court likely lacked jurisdiction over the matter.[11] In light of these proceedings and the Korean court's order, it appears that Hangang has refused to transfer the domain name as directed by Order of this Court. GlobalSantaFe, therefore, now seeks by motion a second amended judgment, which not only directs Hangang and VeriSign to transfer the domain name, but additionally directs VeriSign, the registry, to cancel the infringing domain name pursuant to the ACPA until the domain name is transferred to Global-SantaFe.

## II.

Under the ACPA, suits may be brought *in rem* against a domain name provided certain jurisdictional requirements are met. In addition to meeting these jurisdictional requirements, GlobalSantaFe must also show (i) that it is entitled to relief under the ACPA, (ii) that cancellation is an available remedy under the ACPA, (iii) that the particular method of cancellation requested by GlobalSantaFe is effective and appropriate, and (iv) that concerns of international comity do not preclude such a remedy in the face of the Korean court's injunction. Jurisdiction and entitlement to relief were settled by the Amended Judgment Order, as reviewed briefly below. Also discussed briefly below is the availability of a cancellation remedy under the ACPA. The questions concerning the mechanisms by which cancellation of a domain name may be accomplished and the issues of international comity merit more extensive consideration.

### A. Jurisdictional Requirements under the ACPA

*In rem* ACPA suits must meet several jurisdictional requirements. First, the ACPA allows a trademark owner to file an *in rem* action only in specific jurisdictions, namely "in the judicial district in which the domain name registrar, domain name registry, or other domain name authority that registered or assigned the domain name is located." 15 U.S.C. § 1125(d)(2)(A). This statutory requirement is satisfied here because the domain name registry in this

---

9. VeriSign, the ".com" registry, is the single entity that maintains all official records worldwide for registrations in the " .com" top level domain, while Hangang, as the registrar for <globalsantafe.com>, is one of several entities that is authorized to register ".com" domain names for registrants. *See Cable News Network, L.P. v. CNNews.com*, 162 F.Supp.2d 484, 486 n. 4 (E.D.Va.2001); *aff'd in relevant part, vacated in part* 2003 WL 152846 (4th Cir. Jan. 23, 2003).

10. *See GlobalSantaFe Corp. v. GlobalSantaFe.com*, Civil Action No. 01–1541–A (E.D.

Va. April 1, 2001) (Amended Judgment Order).

11. At the November 15, 2002 hearing on the Motion for Order in Aid of Execution of Judgment, GlobalSantaFe was directed to obtain and file translations of the proceedings in the Korean court. Accordingly, translations of the registrant's Application for Injunction and the Korean court's decision were filed in the record of this case and have been reviewed in considering GlobalSantaFe's motion.

case, VeriSign, is located within this district in Dulles, Virginia.

■ Second, *in rem* actions under the ACPA are appropriate only if there is no personal jurisdiction over the registrant in any district. *See* ACPA, § 1125(d)(2)(A)(ii)(I). This requirement is also plainly met, as there is no evidence that Park or Fanmore have conducted or transacted business in any district in the United States, nor is there any evidence that their actions constitute sufficient minimum contacts to support personal jurisdiction in the United States. *See International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). While it is true that the infringing domain name is included in the VeriSign registry, this is not enough to establish minimum contacts; indeed, even if the registrar were also located in this district, the resultant contacts would still be too minimal to support jurisdiction. *See America Online, Inc., et al. v. Huang*, 106 F.Supp.2d 848, 856–58 (E.D.Va.2000) (holding that registration of a domain name in this district with Network Solutions, Inc., which at the time performed both the registrar and the registry functions, did not constitute sufficient minimum contacts to support suit in this district.). Nor does the nature of the website operating at <globalsantafe.com> provide a jurisdictional nexus; it is a passive, placeholder site, consisting largely of the notice that the site is "under construction," and therefore is not itself a basis for jurisdiction over the registrant. *See ALS Scan, Inc. v. Digital Service Consultants, Inc.*, 293 F.3d 707, 713–14 (2002) (stating the principle that there is no personal jurisdiction on the basis of purely passive Web sites); *Alitalia-Linee Aeree Italiane v. Casinoalitalia.com*, 128 F. Supp 2d 340, 349 (E.D.Va.2001) (same). Thus, there is no personal jurisdiction over Park or Fanmore in this district or, it appears, in any district in this country.

Third, GlobalSantaFe has properly perfected service, as required by the ACPA, by sending notice to the registrant's listed email and postal addresses and by publishing notice in Korean newspapers as directed by Order dated October 23, 2002. *See* 15 U.S.C § 1125(d)(2)(A)(ii)(aa) & (bb).

Finally, the Fourth Circuit has recently affirmed that *in rem* jurisdiction, as authorized by the ACPA, is not a violation of the Due Process Clause of the Constitution, where, as here, "the property itself is the source of the underlying controversy between the plaintiff and defendant," and jurisdiction is assigned "based on the location of the property." *See Porsche Cars North Amer., Inc. v. Porsche.net et al.*, 302 F.3d 248, 260 (4th Cir.2002); *Cable News Network, L.P. v. CNNews.com*, 162 F.Supp.2d 484, 489–92 & n. 21 (E.D.Va. 2001), *aff'd in relevant part, vacated in part* 2003 WL 152846 (4th Cir. Jan. 23, 2003).[12]

### B. Substantive Violation of the ACPA

■ The substantive merits of GlobalSantaFe's ACPA claim are manifest. As the magistrate judge concluded, and as is immediately apparent on its face, the domain name <globalsantafe.com> is confusingly similar to the marks of Global Marine and Santa Fe, and identical to the

---

**12.** The Fourth Circuit's *per curiam* opinion in *Cable News* vacated only those portions of the district court's summary judgment opinion discussing and finding bad faith on the part of the registrant, because the case was decided by the district court prior to the Fourth Circuit's ruling in *Harrods* that a showing of bad faith is not necessary in an *in rem* action under the ACPA. *Id.* at *5 (citing *Harrods*, 302 F.3d at 225). As to the remaining issues on appeal, including personal jurisdiction, trademark infringement, questions of international comity, and the order directing transfer of the domain name, the district court's decision was affirmed. *Id.* at *5–6.

mark of the merged entity GlobalSantaFe. The complaint establishes facts sufficient to show that the GLOBAL MARINE trademark was registered by Global Marine in 1969 and that Santa Fe developed common law trademark rights in the SANTA FE mark through its continuous use of the mark for over fifty years, during which time customers came to associate the mark with Santa Fe's services. GlobalSantaFe inherited those rights upon the merger of the two companies. GlobalSantaFe's applications for the registration of the GLOBALSANTAFE mark, which were submitted to the United States Patent and Trademark ("USPTO") on November 15, 2001, are pending.[13] With regard to Park and Fanmore's rights to the GLOBAL-SANTAFE mark, if any, the record shows that the original registrant clearly registered the <globalsantafe.com> domain name after, and in response to, GlobalSantaFe's use of the GLOBALSANTAFE mark in its merger announcement. Furthermore, there is no indication of any prior use of the GLOBALSANTAFE mark, legitimate or otherwise, by the orginal registrant, Fanmore, or Park. In sum, the magistrate judge properly concluded that the registration of the <globalsantafe.com> domain name, within one day of the merger announcement, is a clear violation of GlobalSantaFe's trademark rights. Moreover, although the magistrate judge correctly found that the record supports a finding of bad faith, subsequent Fourth Circuit precedent makes clear that a showing of bad faith is not required in an *in rem* trademark infringement action under the ACPA. *See Harrods*, 302 F.3d at 228. Thus, the registration of <globalsantafe.com> was in clear violation of the ACPA, and GlobalSantaFe is accordingly entitled to transfer or cancellation of the domain name under § 1125(d)(2)(D)(i).

### C. Availability of Cancellation under the ACPA

The Amended Judgment Order issued on April 1, 2002 directs both VeriSign and Hangang to take all steps necessary to transfer the domain name to plaintiffs within 10 days of receipt of the order.[14] Yet Hangang, the registrar, has not complied with the Order, presumably because it is subject to a Korean court order arising from a case filed by Park shortly after the April 1 Order.[15] It is understandable that the registrar would obey the order of a domestic court despite an order of this court. Notably, while Hangang was named as the defendant in the Korean proceeding, it has not been formally joined as a party in this matter. Further, there is no evidence in the record that Hangang operates in the United States or has sufficient minimum contacts with the United States to satisfy the due process requirements for personal jurisdiction; thus it does not appear on this record that Hangang could be hailed into this Court or any other court in the United States for the

---

**13.** A search of the online records of the USPTO indicates that GlobalSantaFe's applications for the GLOBALSANTAFE mark are still pending. Two applications, serial numbers 78/093,647 and 78/093,641, were published for opposition on January 14, 2003.

**14.** *See GlobalSantaFe Corp. v. GlobalSantaFe.com,* Civil Action No. 01–1541–A (E.D. Va. April 1, 2001) (Amended Judgment Order).

**15.** *See Jong Ha Park v. Han Kang System, Inc.,* District Court of Seoul, No. 50 Civil Court (September 17, 2002) (Order), attached to Pl. Second Addendum to Motion for Order in Aid of Execution of Judgment. As translated, the order is styled a "Provisional disposition of legal prohibition of transfer of the domain name registration information," and appears equivalent to a preliminary injunction order.

purpose of enforcing this Court's order.[16] In any event, Hangang's decision not to comply with the April 1 Amended Judgment Order precipitates this motion.

GlobalSantaFe seeks to vindicate its trademark rights and to protect against their infringement through the domain name holder's use of the infringing domain name. Although, on this record, the registrar and the registrant are beyond the jurisdiction of this Court, the use of the infringing domain name on the Internet will infringe GlobalSantaFe's trademark rights in the United States every time it is accessed here. Furthermore, the operation of the domain name relies on the VeriSign registry, an entity located within this district. Accordingly, the instant motion requests that the Judgment Order be amended to direct Verisign to take the steps necessary unilaterally to cancel the domain name <globalsantafe.com> pending its transfer by Hangang and VeriSign to GlobalSantaFe as ordered.

The ACPA plainly authorizes cancellation as one of the remedies for domain name infringement in *in rem* suits. Thus, the ACPA provides that "[t]he remedies in an *in rem* action under this paragraph shall be limited to a court order for the forfeiture or *cancellation* of the domain name or the transfer of the domain name to the owner of the mark." *See* 15 U.S.C. § 1125(d)(2)(D)(i) (emphasis added). Significantly, the statute does not further describe what transfer or cancellation of a

domain name entails. Therefore, an order to transfer or cancel a domain name must give these remedies their natural meaning and effect, in light of the structure and operation of the domain name system. Similarly, the statute does not provide any guidance as to which remedy is more appropriate in a given situation. Thus, because it is unmistakably clear that both transfer and cancellation are proper remedies under the statute, the appropriateness of either remedy in a given situation will depend on the remedy or remedies requested by the aggrieved party and the appropriateness of those remedies given the specific facts of the case.

### D. The Mechanics of Domain Name Transfer and Cancellation

■ Given the clear authorization of cancellation as a remedy under the ACPA, a significant practical question is presented here, namely, how is cancellation of a domain name to be effectuated? It is important to explore the answers to this question to ensure that any order issued properly accommodates the practical realities of the problem.

There are at least three principle means to achieve cancellation of a domain name. First, the current registrar of the domain name can cancel a domain name by directing the registry to delete the registration information from the Registry Database. Second, the registry for the pertinent top-level domain can disable the domain name in that top-level domain by placing it on

---

**16.** Yet, this Court does not lack jurisdiction over the domain name. First as discussed *supra,* there is *in rem* jurisdiction here over the domain name pursuant to the ACPA, 15 U.S.C. § 1125(d)(2). Second, the registrar certificate submitted by Hangang on December 20, 2001 unequivocally "tenders to the Court complete control and authority over the registration for the above listed domain name registration record." *GlobalSantaFe Corp. v. GlobalSantaFe.com,* Civil Action No. 01–

1541–A (E.D.Va. December 20, 2001) (Registrar Certificate).

Hangang's submission of the registrar certificate includes a promise not to "permit any transfer suspension, or other modification to the registration record . . . except upon receipt of an order of the court or a dismissal of all claims." *Id.* Arguably, therefore, Hangang was prepared to act in accordance with this Court's order, absent a Korean court order enjoining Hangang from doing so.

"hold" status and rendering it inactive. Third, the pertinent registry can cancel a domain name by acting unilaterally to delete the registration information without the pertinent registrar's cooperation. The technical and practical implications of each of these cancellation means merit exploration. As a predicate to this, it is necessary to review the general structure of the domain name system, including the contracts governing the roles of the registrars and the registry with regard to transfer and cancellation of a domain name.

The Internet itself is succinctly described as "an international network of interconnected computers." [17] Each computer connected to the Internet has a unique identity, established by its unique Internet Protocol address ("IP address"). An IP address consists of four numbers between 0 and 255, separated by periods.[18] IP addresses are used to route all transmissions through the Internet. Yet, IP addresses are difficult for individual users of the Internet to remember, a problem which led to development of the domain name system ("DNS"). The DNS allows an individual user to identify a computer using an easier-to-remember alphanumeric "domain name," such as "www.globalsantafe.com," rather than the numerical IP address. The DNS "resolves" the domain name by identifying the particular IP address associated with each domain name.[19]

Significantly, the DNS is not a single master file in one location containing all the registered domain names and the corresponding IP addresses, but rather a hierarchical and distributed system, with each "name server" providing information for its "zone." Under this hierarchical system, the domain name "space" is divided into top-level domains ("TLDs"), such as ".com" and ".net." [20] Each TLD name server provides the information necessary to direct domain name queries to the second-level domain (SLD) name server responsible for the domain name in question.[21] Thus, VeriSign, as the registry for

---

**17.** *Reno v. ACLU,* 521 U.S. 844, 849, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). For a detailed introduction to the Internet and the domain name system *see Thomas v. Network Solutions, Inc.,* 176 F.3d 500, 502–04 (D.C.Cir. 1999); *America Online,* 106 F.Supp.2d at 851–53.

**18.** Individual IP addresses are generally assigned to a particular computer by the Internet Service Provider (ISP) providing the Internet connection for that computer. ISPs, in turn, are allocated blocks of IP addresses by one of the four Regional Internet Registries, such as the American Registry for Internet Numbers. *See* ARIN, Registration Services at http://www.arin.net/registration (February 5, 2003). Thus, the assignment of IP addresses is distinct from the domain name registration process discussed below.

**19.** The DNS offers additional benefits beyond providing an easier-to-remember naming system. Among other benefits, it allows changes at the host computer or Internet Service Provider (ISP) level without individual user confusion or disruption. For example, a change in a host computer's ISP generally necessitates a change in the IP address of that computer. *See Thomas,* 176 F.3d at 503 n. 1 (noting that IP addresses are assigned, in part, on the basis of the host's ISP). In such situations, the individual user can continue using the same domain name, unaware that the corresponding IP address of the host computer has been changed.

**20.** There is a limited set of TLDs. The list of seven "generic" TLDs, which included ".com," ".edu," ".gov", ".int", ".mil", ".net", and ".org," was expanded by the November 2000 selection of seven new generic TLDs including ".biz," ".info," ".name," and ".pro." *See* Top–Level Domains, at http://www.icann.org/tlds (January 1, 2003). In addition, there are over 240 "country-code" TLDs, e.g. ".us" for the United States, and ".kr" for the Republic of Korea. *See id.*

**21.** In other words, the registry's database does not "know" the specific IP address for the named computer, but can direct the domain name query to the second-level name server which does include this data.

all domain names ending in ".com," is responsible for directing domain name queries regarding the "globalsantafe.com" second level domain to the appropriate SLD name server.[22] This SLD name server, in turn, matches the domain name, e.g. "www.globalsantafe.com," with its specific numeric IP address. In other words, the ".com" TLD zone file maintained by Veri-Sign contains a list of all second level domains within the ".com" zone linked to the IP addresses of the SLD name servers for those second level domains, while the "globalsantafe.com" SLD name server maintains the file which matches all domain names in the "globalsantafe.com" SLD zone to the IP addresses of the individual host computers.

Registering, transferring, or deleting a domain name typically involves interaction between the registrar and the registry.[23] The relationship between the registry and the registrars is governed by several contracts, including the Registry–Registrar Agreement, the Registrar Accreditation Agreement, and the .com Registration Agreement.[24] These contracts allocate the responsibilities of a registry and related registrars and establish the processes for domain name registration. The registrars handle the retail side of domain name registration, selling domain names to individual domain name registrants. The registry, in turns, performs a central but more limited function, namely maintaining and operating the unified Registry Database, which contains all domain names registered by all registrants and registrars in a given top level domain, as well as the associated TLD zone file used to resolve domain name queries in that domain. Thus, for each domain name in the ".com" TLD, VeriSign, the ".com" registry, is responsible for maintaining and propagating the following information: (i) the domain name, (ii) the IP addresses of the primary and secondary name server for that domain name, (iii) the name of the registrar for the domain name, and (iv) the expiration date for the registration. *See* Registar Accreditation Agreement § 3.2. Hangang, in turn, as one of many ".com" registrars, maintains the same information for each domain name it sells to a registrant, and in addition, maintains records containing the name and address of the registrant as well as information regarding a technical and administrative contact for each domain name.[25] *See id.* § 3.3.

Interaction between registrars and the registry is highly structured and automated. Registrar-registry communications occur over a secure electronic connection.

---

22. These SLD name servers are typically operated by the domain name holder's ISP

23. There is only one registry that maintains the central database for all domain names in a given TLD. By contrast, there are numerous registrars authorized to register domain names in a given TLD for an individual registrant. *See Cable News,* 162 F.Supp.2d at 486 n. 4.

24. VeriSign operates as the exclusive registry for ".com" domain names pursuant to a contract with the U.S. Department of Commerce and the Internet Corporation for Assigned Names and Numbers ("ICANN"), and also enters into standard contracts with the various ".com" registrars. These contracts can be found on the ICANN website, at http://www .icann.org/tlds/agreements/verisign/com-index.htm (May 25, 2001) (.com Registration Agreement and Registry–Registrar Agreement); http://www.icann.org/registrars/ra–agreement–17may01.htm (May 17, 2001) (Registrar Accreditation Agreement).

25. Thus, while VeriSign's Registry Database provides information as to which *registrar* registered a given domain name, it does not include information identifying who the individual *registrant* for a domain name is, or where the registrant is located. Only the registrar maintains that information.

The registry's role is almost entirely passive, namely to process the registrar's orders while checking to ensure that there are no conflicts within the central Registry Database such as duplicate domain name registrations. Registrars initiate virtually all changes to the Registry Database, by issuing automated commands to the registry, such as ADD, CHECK, RENEW, DEL (delete), MOD (modify), and TRANSFER.[26] *See* .com Registry Agreement App. C.

There are contractual restrictions in VeriSign's authorizing contracts which generally bar VeriSign from changing the information in the Registry Database on its own initiative. First, VeriSign's authorizing contract specifies that it can only register domain names in response to requests from registrars, and that it cannot act as a registrar with respect to the registry's TLD.[27] However, exceptions permit VeriSign to register a limited number of specified domain names for its own use and for ICANN's use.[28] Second, the standard form Registry–Registrar Agreement grants VeriSign only a limited license to use the registration data submitted by the registrar "for propagation of and the provision of authorized access to the TLD

zone files."[29] Thus, as contemplated in the agreements, transfer or cancellation of a domain name normally requires the approval or initiative of the current registrar.[30]

With this general background regarding the domain name system and the registrar-registry relationship, the three principle means of cancelling a domain name can be meaningfully explored.

Under normal procedures, a domain name is canceled by the issuance of a delete command by the domain name's current registrar. The current registrar uses the DEL command to instruct the registry to delete all information regarding the domain name from the Registry Database and the TLD zone file. *See* .com Registry Agreement at § 4.3.3. The removal of this information completely and effectively cancels the domain name. This is so, because any attempt to use the domain name will fail, owing to the removal of the pertinent information from the registry's TLD zone file.[31] Importantly, because the registration information has been deleted from the Registry Database, the individual domain name will once again be available for registration to any registrant on a first-come, first-served basis.[32]

---

26. For example, in order to register a new domain name for an individual end user, the registrar sends to the registry the ADD command as well as the information the registry needs to populate its database, namely the domain name, the IP addresses of the local name servers for that domain name, the registrar, and the expiration date for the registration. The registry, in turn, either enters this information into the central Registry Database and the TLD zone file, or returns an error message if, for example, the domain name is already registered.

27. *See* .com Registry Agreement § II.23(C). The contract with ICANN does allow an affiliate of the registry, including a wholly-owned subsidiary, to act as a registrar. *See id.*

28. *See id.* at § II.24.

29. *See* Registry–Registrar Agreement § 2.5.

30. *See* .com Registry Agreement App. C. § 4.3.10 (Transfer); § 4.3.3 (Deleting a Domain Name).

31. Individual users will be able to access the host computer formerly linked to the deleted domain name only if they know the actual IP address of the host computer and enter it directly, rather than using the domain name. And, since use of domain names is so ubiquitous, few if any users will know the relevant IP address.

32. Transfer of a domain name, unlike cancellation, does not open up the domain name to registration on a first-come, first-served basis, but rather reassigns the domain name to the

This method of cancellation also has the virtue of using the established channels for registrar-registry communication to effectuate complete cancellation of the domain name. Yet, this approach requires cooperation by the current registrar, and thus may not be effective in situations where, as here, the registrar has declined to cooperate and is beyond the jurisdiction of United States courts.[33]

The second means of cancellation does not require the approval or initiative of the current registrar. Although VeriSign is not contractually authorized to delete a domain name registration on its own initiative, the registry may nonetheless unilaterally disable a domain name. VeriSign can render a domain name "inactive" by placing the domain name in REGISTRY–HOLD status.[34] When a domain name is placed on REGISTRY–HOLD status, the domain name is removed from the TLD zone file but the information in the Registry Database is otherwise unchanged. The practical effect of this type of cancellation is twofold. On the one hand, the removal of the domain name from the TLD zone file renders it functionally useless, as attempts to locate the domain name and an associated IP address in the

DNS will fail. On the other hand, the domain name remains registered to the current, infringing registrant and cannot be registered by the trademark holder or anyone else. Thus, the infringing domain name is rendered "inactive" but remains registered.[35] In other words, if the domain name <globalsantafe.com> were disabled in this manner, individual users who attempted to access the domain name on the Internet would receive an error message indicating that the domain name could not be found, yet GlobalSantaFe could not register the domain name for its own use because it would still be registered by Park and Fanmore.

This disabling approach offers less than a complete cancellation remedy, yet it has a significant advantage over cancellation pursuant to a registrar's command; namely that VeriSign is contractually authorized to take this action unilaterally without the cooperation of the current registrar. Thus, this disabling approach may be preferable in circumstances where, as here, a recalcitrant registrar is beyond a court's jurisdiction. Unfortunately, where the current registrant is simply holding the domain name rather than putting it to any

acquiring registrar and registrant. Nonetheless, there are some circumstances where cancellation of a domain name is a preferable remedy. In particular, if the infringing registrant is effectively enjoined or otherwise prevented from re-registering the domain name, and the trademark holder is not itself interested in using the domain name, cancellation may be a less expensive remedy than registration, which requires the payment of annual fees to the registrar for any active domain name.

**33.** The usual process for transfer likewise requires cooperation by the current registrar. Transfers are normally commenced by a TRANSFER request issued to the registry by the transferee's registrar; yet, the registry must notify the current registrar of the transfer request and may not process the transfer

request absent approval by the current registrar. *See* .com Registry Agreement App. C. § 4.3.10 (Transfer).

**34.** *See* .com Registry Agreement App. C. § 6.1. The REGISTRY–HOLD status is described as follows: "The registry sets the domain to this status. The domain cannot be modified or deleted by the registrar ... The domain SHALL NOT be included in the zone file when in this status." *Id.*

**35.** The Registry Agreement clearly contemplates registered domain names that are nonetheless inactive. *See id.,* § I.6 ("A name in a Registry Database may be a Registered Name even though it does not appear in a TLD zone file (e.g. a registered but inactive name.)").

practical use, as is true here, disabling the domain name will have minimal practical effect—the trademark holder will still not be able to use the domain name, and the cybersquatter can continue squatting on the domain name as long as he keeps the registration active.[36]

A third means of cancellation involves a court order directing VeriSign to act unilaterally to cancel the domain name by deleting the registration information in the Registry Database and removing the domain name from the TLD zone file, without regard to the current registrar's lack of cooperation and the normal contractual procedures for cancellation. As discussed in the *Cable News Network* case, VeriSign's maintenance and control of the central Registry Database and the vital .com TLD zone file "effectively enables Verisign to transfer control of any '.com' domain name.'" *Cable News Network, L.P. v. CNNews.com*, 177 F.Supp.2d 506, 514 n. 16 (E.D.Va.2001); *aff'd in relevant part, vacated in part* 56 Fed.Appx. 599 (4th Cir.2003). Similarly, it is apparent that VeriSign's physical control of these files enables VeriSign to cancel any ".com" domain name by deleting the relevant information in the Registry Database and the TLD zone file.[37] It may be that taking such a step would require a change in VeriSign's procedures and programming to allow the registry to delete the information without approval by the current registrar. Yet, nothing in the record indicates cancelling a domain name without the current registrar's consent is beyond VeriSign's physical or technical capabilities.

With regard to unilateral cancellation or transfer, it should be noted that VeriSign has indicated that it would oppose an order directing VeriSign unilaterally to transfer or cancel a domain name on grounds that such an order would require VeriSign to violate its contracts with the registrar and with ICANN and to interfere with the registrar-registrant contract.[38] Yet, it is not clear that VeriSign would, in fact, be acting in violation of its authorizing contract, as transferring or canceling a domain name pursuant to a direct court order does not constitute "acting as a registrar" in contravention of the authorizing contract from ICANN. Furthermore, Hangang is in breach of its duties under the Registry–Registrar agreement and the Registrar Certificate it submitted owing to its failure to transfer the domain name pursuant to the April 1 Order. Thus, it is not clear to what extent VeriSign is still bound by the terms of the limited license granted by Hangang, particularly when Hangang has already tendered to the Court "complete control and authority over the registration" of <globalsantafe.com>. *GlobalSantaFe Corp. v. GlobalSantaFe.com*, Civil Action No. 01–1541–A (E.D.Va. December 20, 2001) (Registrar Certificate). Finally, VeriSign's

---

**36.** Disabling a domain name would have greater practical effect in situations where the infringing domain name is used to direct traffic to a website that itself further infringes on the trademark holder's rights through dilution or direct infringement. In these situations, disabling the domain name will help to stem the flow of traffic to the infringing website.

**37.** In this regard, unilateral transfer pursuant to a court order is more complex than unilateral cancellation because it involves not merely the deletion of information within Veri-

Sign's control, but also the substitution of new registrar and local name server information for the domain name, and hence the cooperation of the *acquiring* registrar.

**38.** VeriSign is currently not a party to this action. However, the record contains letters from VeriSign to GlobalSantaFe's counsel expressing opposition to a unilateral transfer or cancellation order, which have been attached to GlobalSantaFe's Motion for an Order in Aid of Execution of Judgment.

contractual agreements with ICANN and Hangang cannot serve to limit the trademark rights and remedies granted to GlobalSantaFe by federal law under the Lanham Act and the ACPA. While the ACPA expressly authorizes a "court order for the . . . cancellation of the domain name," it does not require that such orders be directed only at the current registrar, nor does it shield the registry from cancellation orders. 15 U.S.C. § 1125(d)(2)(D)(i). Thus, VeriSign's contracts with ICANN and with the registrar should not be read to limit GlobalSantaFe's federal trademark rights and remedies. Simply put, the interest in vindicating congressionally provided trademark rights trumps contract. In any event, for the reasons that follow, it is not necessary to reach the question of unilateral transfer or deletion of a domain name by the registry in this case.

In sum, all three means of cancellation may be appropriate means of carrying out the cancellation remedy granted by the ACPA. To be sure, it is normally appropriate to direct a cancellation order primarily at the current domain name registrar and to direct that cancellation proceed through the usual channels. However, in situations, where, as here, such an order has proven ineffective at achieving cancellation, it becomes necessary to direct the registry to act unilaterally to carry out the cancellation remedy authorized under the ACPA. In this regard, a court is not limited merely to the disabling procedure envisioned by VeriSign's contractual agreements, but may also order the registry to delete completely a domain name registration pursuant to the court's order, just as the registry would in response to a registrar's request. Indeed, in order to vindicate the purposes of the ACPA, disabling alone in many cases may not be sufficient, for it does not oust the cybersquatter from his perch, but rather allows the cybersquatter to remain in possession of the name in violation of the trademark holder's rights.

In this regard, the physical location of the ".com" registry within this district is quite significant, for it is the location of the registry here which establishes the situs of the power to transfer or cancel the domain name within this district, pursuant to the ACPA, even if the registrar has not submitted a registrar certificate granting the court authority over the disputed domain name. *See Cable News Network,* 177 F.Supp.2d at 514 n. 17. Significantly, if the infringing domain name were registered in a top-level domain whose registry was outside the United States, jurisdiction in the United States might be avoided entirely, provided the registrar is also foreign and the individual registrant lacks sufficient contacts with the forum to meet the due process requirements for personal jurisdiction. In other words, there is a significant gap in the ACPA's trademark enforcement regime for domain names registered under top-level domain names, such as the foreign country code domain names, whose registry is located outside the United States.

The current ability to assert jurisdiction over a large number of domain names in this district pursuant to the ACPA hinges on two factors, (i) the location of VeriSign within this district and (ii) the current popularity of the ".com" and ".net" top-level domain names, particularly for commercial Internet operations. Either factor may change in the future. Indeed, a recent law review article concerning the ACPA argues that an aggressive assertion of United States jurisdiction and control over the domain name system based on its essentially arbitrary physical geography may have the unintended consequence of causing a segmentation of the domain name system as other countries seek to assert their own control over the Internet

by establishing competing and conflicting systems physically located outside the United States.[39] Even absent such segmentation, a desire to avoid United States jurisdiction may cause foreign registrants to choose to use domain names within their respective country code top-level domains, whose registries are located in and operated by the foreign countries, rather than the currently popular "generic" domain names such as ".com" and ".net." The result may be an increasing number of domain names registered out of the reach of United States jurisdiction, but accessible to United States users through the universal domain name system, which in turn will pose a serious challenge to the enforcement of United States trademark rights on the Internet.

In any event, in this case, the narrow issue presented is whether the circumstances justify a second amendment of the judgment order to include an order directing VeriSign to cancel the domain name by disabling it.[40] Given the nature of the specific relief requested by GlobalSantaFe, it is unnecessary to consider whether complete cancellation of the domain name by VeriSign is appropriate here. As discussed *supra*, cancellation of the infringing domain name is clearly authorized as a remedy under the ACPA, and disabling the domain name through removal of the pertinent information from the TLD zone file is the least intrusive practical means of achieving cancellation without the cooperation of the registrar. Thus, the amended judgment order requested by GlobalSantaFe in this matter is legally valid and practically appropriate.

### D. International Comity

▪ The remaining question in this motion for further amendment in aid of execution of judgment is whether concerns of international comity dictate deference to the injunction issued by the Korean court. In this regard, neither the general law regarding abstention in favor of a foreign court's adjudication of *in rem* actions, nor the specific concerns raised by the facts of this case counsel against the requested cancellation remedy.

▪ The law regarding competing jurisdiction in *in rem* actions is clear: "[A]ccording to longstanding precedent and practice, the first court seized of jurisdiction over property, or asserting jurisdiction in a case requiring control over property, may exercise that jurisdiction to the exclusion of any other court." *See Sec. and Exch. Comm'n v. Banner Fund Int'l,* 211 F.3d 602, 611 (D.C.Cir.2000); *Al–Abood v. El–Shamari,* 217 F.3d 225, 231 (4th Cir.2000) (recognizing the first-in-time rule for determining jurisdiction in *in rem* actions, but finding it inapplicable in that case). This doctrine, known as the *Princess Lida* doctrine, applies only to *in rem* or *quasi in rem* cases, and requires federal courts to decline jurisdiction over a particular property or *res* over which another court has already asserted jurisdiction. *See Al–Abood,* 217 F.3d at 231; *Princess Lida of Thurn & Taxis v.*

---

**39.** *See* Catherine T. Struve and R. Polk Wagner, Realspace Sovereigns in Cyberspace: Problems with the Anticybersquatting Consumer Protection Act, 17 Berkeley Tech. L J. 989, 1019–1041 (2002).

**40.** GlobalSantaFe's motion makes clear that the specific relief requested is for a modification of the Court's existing *in rem* order to add a new paragraph directing VeriSign,

the registry for the domain name at issue, to disable resolution of the domain name by eliminated the currently associated domain name server IP numbers from the "dot com" TLD zone file.

Thus, GlobalSantaFe requests cancellation through an order directing VeriSign to disable, rather than delete, the infringing domain name.

*Thompson,* 305 U.S. 456, 465–66, 59 S.Ct. 275, 83 L.Ed. 285 (1939). Although originally developed in the context of federalism, the first-in-time rule has since been applied to federal cases with parallel proceedings underway in another country. *See Banner Fund,* 211 F.3d at 611; *Dailey v. Nat'l Hockey League,* 987 F.2d 172, 175–76 (3d Cir.1993).

With regard to the first-in-time rule, the facts clearly establish that this Court was the first to assert jurisdiction over the domain name. Park's application for an injunction was filed with the District Court of Seoul on April 9, 2002, six months after GlobalSantaFe's filing of the *in rem* action in this Court. *See Banner Fund,* 211 F.3d at 612 (using the filing of the action as the relevant date for the first-in-time analysis). In fact, Park's initiation of proceedings in the foreign court also followed (i) Hangang's deposit of the registrar's certificate with this Court, on December 20, 2001, and (ii) both the original Judgment Order entered on March 25, 2002 and the Amended Judgment Order entered on April 1, 2002. Clearly, then, this Court is not obligated under the rule in *Princess Lida* to cede jurisdiction over the domain name in light of the subsequent order issued by the Korean court.

As noted in *Banner Fund,* acquiescence to a foreign court is not only not required in this instance, it is also not appropriate:

> True, we cannot require a foreign court to yield when the United States court was the first to assume jurisdiction, but neither can we acquiesce in a rule under which the United States court recedes regardless of its priority in time. That rule would empower a defendant in the United States to oust our courts of *in rem* jurisdiction merely by filing its own action in the courts of any hospitable country—of which there would be no shortage if that were our rule.

*Id.* at 611–12. Here, acquiescence to the order of a foreign court is particularly inappropriate, since the foreign proceeding did not commence until the matter had been fully adjudicated here. Moreover, the Korean proceeding was obviously begun with the intent of blocking the Judgment Order, which was already announced.[41] Thus, in this case there is no basis for ceding jurisdiction to the Korean court, or granting deference to its order blocking the transfer of the domain name.[42]

---

**41.** In *Banner Fund,* by contrast, the foreign court action was initiated shortly after proceedings began in the United States District Court, with the result that proceedings were ongoing in both locations. *Id.* at 607. Even given concurrent proceedings, as in *Banner Fund,* the *Princess Lida* rule, applied symmetrically, dictates that the first court to seize jurisdiction over the *res* prevails. *Id.* at 612.

**42.** To be sure, the District Court of Seoul, which refused to recognize this Court's *in rem* jurisdiction under the ACPA, is not likely to cede jurisdiction in this matter under the first-in-time rule. Instead, the Korean court's discussion of jurisdiction focuses on whether jurisdiction is properly founded on the location of the registry or the registrar. The Korean court concluded that the location of the registrar, but not the registry, is a proper basis for asserting jurisdiction. The Korean court based this conclusion on the ground that registrars handle the registration, cancellation, and transfer of domain names, while the registry serves the purely passive function of maintaining the database. As an aside, this characterization is not entirely accurate; the registry, after all, is the agency which physically controls the domain name database and actually effectuates the requested changes. Furthermore, to the extent that domain names, when considered as property, have a "location," the registry's central database is the logical location of such property. This database, although accessible worldwide through the Internet, is physically located in Dulles, Virginia. Furthermore, as a practical matter, the location of the domain name at the site of the registry has the virtue of being relatively fixed and unchanging, unless the

Although the *Princess Lida* first-in-time rule supports this Court's jurisdiction in this matter and counsels against deference to the Korean court ruling, the international aspect of this case and the existence of conflicting court orders compiles consideration of the important question of comity among nations. *See Banner Fund*, 211 F.3d at 612 (holding that the international proceeding did not deprive the district court of jurisdiction, but did "raise a concern with comity among nations"). First, "[c]omity ordinarily requires that courts of a separate sovereign not interfere with concurrent proceedings based on the same transitory claim, at least until a judgment is reached in one action." *Id.* (citing *Laker Airways, Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C.Cir.1984)). This factor does not counsel against amending the Judgment Order in this case to include cancellation, for the Korean and American proceedings are not concurrent. Indeed, in this case, judgment had already issued before the Korean proceeding was commenced. Park initiated the Korean court proceedings specifically to block the already-issued final judgment in this case. Second, "a domestic forum is not compelled to acquiesce in pre or postjudgment conduct by litigants which frustrates the significant policies of the domestic forum." *Id.* (citing *Laker Airways*, 731 F.2d at 915). In this regard, "in determining whether to apply comity to the Order of a foreign court of competent jurisdiction we must consider our own laws and the public policy, as well as the rights of our residents under the laws of the United

States." *In re Enercons Virginia, Inc.*, 812 F.2d 1469, 1473 (4th Cir.1987). Registrants Park and Fanmore violated GlobalSantaFe's trademark rights under United States law by registering the domain name <globalsantafe.com>. Clearly, there is significant interest in this forum in protecting and vindicating GlobalSantaFe's trademark rights against this violation, as well as in ensuring that the ".com" registry, located within this district, is not used in furtherance of the violation. In sum, there is clearly no basis for abstention on comity grounds where, as here (i) the proceedings are not concurrent, the Korean proceeding having been commenced in an effort to block enforcement of the already issued judgment in this case, (ii) the foreign court proceeding is intended to frustrate the enforcement of the Judgment of this Court, and (iii) that Judgment supports significant public policies under United States law. Thus, comity concerns do not bar the amendment of the Judgment Order to grant GlobalSantaFe the additional remedy of cancellation to which it is entitled under the ACPA.

## III.

Accordingly, by accompanying orders, GlobalSantaFe's motion in aid of execution of judgment is granted, and a Second Amended Judgment Order is entered, which additionally orders VeriSign to disable the <globalsantafe.com> domain name until it is transferred as ordered to GlobalSantaFe. Specifically, VeriSign is directed not to delete entirely the pertinent domain name registration information

---

central database itself is moved to another location. By contrast, an unlawful registrant can shift jurisdiction based solely on the location of the registrar by switching registrars from one jurisdiction to another, thereby eluding enforcement orders.

In any event, the Korean court's conclusion that jurisdiction turns only on the registrar's

location is flatly contrary to the ACPA, which explicitly permits *in rem* suits in either location. *See* 15 U.S.C. § 1125(d)(2)(A). Moreover, under the *Princess Lida* doctrine, the first court with competent jurisdiction to assert jurisdiction over the property prevails, not the court in whose jurisdiction the disputed property is arguably located.

in the Registry Database, but rather to disable the domain name by eliminating the currently associated domain name server IP numbers from the TLD zone file.

The Clerk is directed to send a copy of this Memorandum Opinion to defendant and to all counsel of record.