# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2021-CA-01304-SCT

*JONATHAN CARR*

*v.*

*MISSISSIPPI LOTTERY CORPORATION*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/26/2021 |
| TRIAL JUDGE: | HON. RANDI PERESICH MUELLER |
| TRIAL COURT ATTORNEYS: | DEIDRA J. BASSI |
| | BRETT W. ROBINSON |
| | CHRISTOPHER B. McDANIEL |
| | BRYAN C. SAWYERS |
| | JONATHAN P. DYAL |
| | R. MARK ALEXANDER, JR. |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | CHRISTOPHER B. McDANIEL |
| | BRETT W. ROBINSON |
| ATTORNEYS FOR APPELLEE: | BRYAN C. SAWYERS |
| | R. MARK ALEXANDER, JR. |
| | JONATHAN P. DYAL |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 11/10/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, C.J., COLEMAN AND CHAMBERLIN, JJ.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1. This case presents an issue of first impression that asks this Court to interpret and apply the federal Anticybersquatting Consumer Protection Act (ACPA). 15 U.S.C. § 1125(d). Jonathan Carr registered five domain names that included variations of the identifying marks of the Mississippi Lottery Corporation (MLC). After an unfavorable

decision from a national arbitration board, Carr brought a reverse domain name hijacking claim in the Harrison County Circuit Court against the MLC, which countersued for cybersquatting. This Court dismissed Carr's first appeal to this Court in this case for lack of a final appealable judgment. *Carr v. Miss. Lottery Corp.*, 314 So. 3d 108, 112 (Miss. 2021). Carr now appeals the trial judge's Order Granting and Denying Motions for Injunctive Relief, Order on Motion for New Trial, or In the Alternative, Motion for a Trial By Jury, and Order on Motion for New Trial and/or In the Alternative, to Alter or Amend the Judgment. After a careful review of federal and state law, this Court affirms the decisions of the trial court on all issues.

## FACTS AND PROCEDURAL HISTORY

¶2. Starting on December 30, 2017, and ending on August 7, 2018, Jonathan Carr registered with GoDaddy.com the following five domain names: mslottery.com, mississippilottery.com, mslottery.us, mississippilottery.us and mississippilottery.org.

¶3. On August 31, 2018, the creation of a Mississippi lottery was approved by the governor. *See* S.B. 2001, 1st Extraordinary Sess., 2018 Miss. Laws ch. 2. On October 19, 2018, the governor appointed five members to the board of directors for the Mississippi Lottery Corporation as required by Mississippi Code Section 27-115-9 (Supp. 2022). The MLC applied for federal trademarks with the United States Patent and Trademark Office (USPTO) on March 11, 2019, and obtained state trademarks for "Mississippi Lottery Corporation" and "Mississippi Lottery" on March 19, 2019, from the Mississippi secretary of state.

¶4.     On March 4, 2019, Carr contacted Lucien Smith, an attorney at the firm representing the MLC, via text message, asking Lucien Smith to call him.  On April 3, 2019, Bill Smith, another attorney at the firm representing the MLC, contacted Carr at the request of Lucien Smith.   Over the course of the conversation between Bill Smith and Carr, the sale of Carr's domain names was discussed.  Carr contends in his affidavit that Bill Smith initiated the discussion regarding the purchase of the domain names and pressured him during the conversation to the point that he became extremely uncomfortable and wished to contact his attorney.  Bill Smith avers in his affidavit that Carr stated that he "foresaw the need for a lottery website for the State of Mississippi and, following research and as an investment, registered over 100 variations of Mississippi Lottery-related domain names" which he believed had great value.  Bill Smith contends that when he offered to pay Carr a reasonable amount for the domain names, Carr stated that he wished to contact counsel.  Scott Andress, another attorney representing the MLC, sat in on the call with Carr and took notes during the conversation that support Bill Smith's recollection of the call.

¶5.     On April 9, 2019, attorney Robert Deming contacted Bill Smith on behalf of Carr to discuss the sale of the domain names.  Carr does not dispute that Deming called Bill Smith on his behalf.

¶6.     On May 10, 2019, the MLC filed a domain name dispute complaint with the National Arbitration Forum (NAF) under the Uniform Domain Name Dispute Resolution Policy (UDRP).  Before service of the NAF complaint was completed, Carr filed a business name reservation with the Mississippi secretary of state on May 16, 2019, for a for-profit business

under the name Mississippi Lottery Corporation. On July 15, 2019, the NAF entered its order in favor of the MLC, which required Carr to transfer ownership of all five domain names to the MLC.

¶7. Under the UDRP, Carr had ten days after the arbitration decision to file a lawsuit that would stay the arbitrator's ruling pending the outcome of the case and prevent the transfer of the domain names to the MLC. UDRP 4k, icann.org/resources/pages/policy-2012-02-25-en (adopted Aug. 26, 1999). Carr timely filed suit in the Harrison County Circuit Court seeking to prevent the enforcement of the NAF order. Carr claimed that the MLC was reverse domain-name hijacking his domain names and asked the court for declaratory and injunctive relief from the NAF order. *See* 15 U.S.C. § 1114(2)(D)(v). The MLC countersued for breach of the domain-name registration agreement; cyberpiracy under the ACPA; false designation of origin; trademark infringement and negligence per se under Mississippi Code Section 97-33-33 (Rev. 2020). The MLC asked the court for statutory damages up to $100,000, actual damages, costs, attorneys' fees and preliminary and permanent injunctions. The MLC and Carr both filed motions for a preliminary injunction seeking relief under the ACPA.

¶8. On October 22, 2019, the court held a hearing on the motions for preliminary injunction. Due to the short time period before the MLC planned to launch ticket sales on November 25, 2019, the hearing was consolidated into a trial on the merits under Mississippi Rule of Civil Procedure 65(a)(2). Carr's counsel stated on record that he agreed that time was of the essence and would defer to the court's judgment on whether consolidation was

4

necessary but wanted to ensure that Carr was not waiving his right to a jury trial. The trial court noted that consolidation was limited to the parties claims for injunctive relief and assured Carr's counsel that Carr was not waiving his right to a trial by jury.

¶9. On November 8, 2019, the trial court entered a permanent injunction order in favor of the MLC, finding that the MLC "had established the criteria under the ACPA and Mississippi law warranting injunctive relief." The order required Carr to transfer ownership of the five domain names within seven days of entry of the order; refrain from commercial use of the term "Mississippi Lottery" or any variation thereof and withdraw his name reservation with the secretary of state. Carr's motion for preliminary injunction was denied as moot.

¶10. Carr timely filed a motion for a new trial, which was denied on February 21, 2020. He then appealed to this Court on March 16, 2020. This Court dismissed the appeal upon finding that, according to "Rule 54(b), both the November 8, 2019 order and the February 21, 2020 order are interlocutory and not final." *Carr*, 314 So. 3d at 112.

¶11. After the appeal was dismissed, the MLC filed a motion in the Harrison County Circuit Court to voluntarily dismiss its remaining counterclaims and claims for damages. Additionally, the MLC filed a motion for entry of final judgment stating that if its motion for voluntary dismissal was granted, then the only remaining claim would be the injunctive relief the court already had denied.

¶12. On June 14, 2021, Carr filed a motion for leave to file an amended complaint under Mississippi Rule of Civil Procedure 15(a). Carr claimed that the consolidation of the hearing

5

with a trial on the merits had prevented him from having his case heard before a jury and wished to seek additional damages including costs, attorneys' fees, statutory damages and punitive damages. Carr claimed that no prejudice would result from the amendment of the complaint because the matter was still in its initial phase before discovery. On July 19, 2021, Carr also filed a motion to dissolve or modify the permanent injunction.

¶13. The Harrison County Circuit Court entered its final judgment on July 23, 2021. The court granted the MLC's motion to dismiss the remaining counterclaims and claims for damages and also granted its motion for entry of final judgment. The court denied Carr's motions to amend his complaint and dissolve or modify the permanent injunction because they were moot after the grant of the MLC's motions.

¶14. Carr timely filed a motion for new trial or, in the alterative, a motion to alter or amend the judgment. On November 9, 2021, the court denied Carr's motion. Carr timely appealed to this Court.

## ISSUES PRESENTED

¶15. The issues Carr raises on appeal can best be summarized as follows:

I.     Whether the trial court erred by granting the permanent injunction to the MLC.

II.    Whether the trial court erred by consolidating the hearing for a preliminary injunction with a trial on the merits.

III.   Whether the trial court erred by denying Carr's Motion for Leave to File Amended Complaint.

IV.    Whether the trial court erred by denying Carr's Motion to Dissolve or Modify Permanent Injunction.

6

## DISCUSSION

### I. The trial court did not err by granting a permanent injunction to the MLC.

¶16. The Mississippi Supreme Court requires a party to prove the following four factors in order to merit injunctive relief: "(1) whether there exists a substantial likelihood that plaintiff will prevail on the merits; (2) the injunction is necessary to prevent irreparable injury; (3) threatened injury to the plaintiffs outweighs the harm an injunction might do to the defendants; and (4) entry of a preliminary injunction is consistent with the public interest." *Elec. Data Sys. Corp. v. Miss. Div. of Medicaid*, 853 So. 2d 1192, 1207-08 (Miss. 2003) (citing *City of Durant v. Humphreys Cnty. Mem'l Hosp./Extended Care Facility*, 587 So. 2d 244, 250 (Miss. 1991)). In Carr's motion for preliminary injunction, he asked the court to order the release of the domain names from the registrar lock to allow him to revise his website. The MLC asked the court in its motion for preliminary injunction to order the immediate transfer of the domain names from Carr to the MLC. Carr challenges every element of the permanent injunction that the court granted to the MLC.

¶17. "On appeal, we give a circuit-court judge presiding in a bench trial 'the same deference with regard to his findings as a chancellor.'" *Cascio v. Cascio Invs., LLC*, 327 So. 3d 59, 68 (Miss. 2021) (internal quotation marks omitted) (quoting *Falkner v. Stubbs*, 121 So. 3d 899, 902 (Miss. 2013)). "[W]e review the circuit court's interpretation and application of the law de novo, and its findings of fact will not be reversed if supported by substantial evidence." *Falkner*, 121 So. 3d at 902 (citing *Davis v. Smith (In re Est. of Smith)*, 69 So. 3d 1, 4 (Miss. 2011)).

7

### A. There is a substantial likelihood that the MLC will prevail on the merits.

¶18.   The ACPA was passed by Congress on November 29, 1999,

> to "protect consumers and American businesses, to promote the growth of online commerce, and to provide clarity in the law for trademark owners by prohibiting the bad-faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from the goodwill associated with such marks—a practice commonly referred to as 'cybersquatting.'"

*Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc*, 202 F.3d 489, 495 (2nd Cir. 2000) (quoting S. Rep. No. 106-140, at 4 (1999)).  The ACPA creates a federal solution for cybersquatting that remedies inadequacies of the protection afforded under federal trademark laws, such as the Lanham Trade-Mark Act and the Federal Trademark Dilution Act.  *Id.*;*see* Louis Altman & Malla Pollack, *Callmann on Unfair Competition, Trademarks and Monopolies* § 22:40 (4th ed. 2022).

> Cybersquatting involves the registration as domain names of well-known trademarks by non-trademark holders who then try to sell the names back to the trademark owners. Since domain name registrars do not check to see whether a domain name request is related to existing trademarks, it has been simple and inexpensive for any person to register as domain names the marks of established companies. This prevents use of the domain name by the mark owners, who not infrequently have been willing to pay "ransom" in order to get "their names" back.

*E. & J. Gallo Winery v. Spider Webs Ltd.*, 129 F. Supp. 2d 1033, 1043 (S.D. Tex. 2001) (quoting *Sporty's*, 202 F.3d at 493).

¶19.   The ACPA states in relevant part:

(d) Cyberpiracy Prevention

(1)(A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if,

8

without regard to the goods or services of the parties, that person -

> (i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and

> (ii) registers, traffics in, or uses a domain name that -

>> (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

>> (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or

>> (III) is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

15 U.S.C. § 1125(d)(1)(A).

¶20. To prevail in a cybersquatting claim, the MLC must show (1) it owns a valid trademark entitled to protection, (2) its mark was distinctive or famous at the time of registration, (3) Carr used, registered or trafficked in the domain name, (4) Carr's domain names are identical or confusingly similar to the MLC's mark and (5) Carr had a bad faith intent to profit. 15 U.S.C. § 1125(d)(1)(A); *Tartell v. S. Fla. Sinus & Allergy Ctr., Inc.*, No. 12-61853-Civ-Dimitrouleas/Snow, 2013 WL 11971280, at *2 (S.D. Fla. Dec. 30, 2013) (quoting *King Ranch, Inc. v. King Ranch Contractors, LLC*, No. 6:12-cv-597-Orl-37KRS, 2013 WL 2371246, at *10 (M.D. Fla. May 30, 2013)). Carr's claim for reverse domain name hijacking can only prevail if he can demonstrate that his use of the domain names is lawful under the ACPA. 15 U.S.C. 1114(2)(D)(v). The trial court found that the "Mississippi Lottery has established the criteria under the ACPA and Mississippi law warranting

9

injunctive relief."

### i. The MLC owns a valid mark that is entitled to protection.

¶21.    Carr argues that the MLC federal trademark applications are insufficient to prove ownership of a trademark.  But a mark does not have to be federally registered to qualify for protection under the ACPA.  *Matal v. Tam*, 137 S. Ct. 1744, 1752-53, 198 L. Ed. 2d 366 (2017).  Additionally, during the pendency of this litigation the USPTO has approved the MLC federal trademarks for Mississippi Lottery Corporation, Registration Number 6,421,501, and Mississippi Lottery, Registration Number 6,442,583.  This Court takes judicial notice that the MLC currently possesses these two federal trademarks.[1] *See In re Validation of Tax Anticipation Note, Series 2014*, 187 So. 3d 1025, 1035 (Miss. 2016) (this Court took judicial notice of certified copies of the minutes of a board of supervisors and stated that it may take judicial notice of certified copies of public records).

¶22.    The MLC also holds multiple state trademarks for the names "Mississippi Lottery Corporation" and "Mississippi Lottery."  Carr argues that state registrations do not give rise to the same presumption of validity and ownership as does a federal registration.  Carr cites a nonbinding decision by the World Intellectual Property Organization (WIPO) Arbitration and Mediation panel to support this argument.  *See Mobile Commc'n Serv. Inc. v. WebReg, RN*, WIPO Case No. D2005-1304 (Feb. 24, 2006),

---

[1] Proof of these trademarks are public record that can be found online in the USPTO's database.  *See* Trademark Electronic Search System, USPTO, uspto.gov/trademarks/search (click "Search (TESS)"; then click "Basic Word Mark Search (New User)"; enter "Mississippi Lottery" as the search term).

https://www.wipo.int/amc/en/domains/decisions/html/2005/d2005-1304.html ("State trademark registrations, though, are entitled to minimal weight because they are not examined and thus do not represent persuasive evidence of ownership of a valid, distinctive trademark.").[2] This Court, however, does not have to decide whether state trademarks are entitled to an equal presumption as that of federal trademarks in order to resolve the issues presented in this case.

¶23. Additionally, it is a misdemeanor under Mississippi Code Section 97-33-33 (Rev. 2020) to advertise the lottery unless authorized by the MLC. Although this does not necessarily mean the MLC owns the marks, it is evidence that it has exclusive rights to use the marks.

¶24. The trial court found that Carr has no protected trademarks in the name "Mississippi Lottery." This Court agrees that these facts indicate ownership of a valid mark by the MLC.

### ii. The MLC's mark was distinctive at the time of registration of the domain names.

¶25. Carr contends that the MLC did not own or use a mark that was distinctive when he registered his domain names. Carr argues that "even if a mark is found to be distinctive, the plain language of the ACPA requires the actual existence of the mark at the time of disputed domain name's registration." *See **Thompson v. Does 1-5***, 376 F. Supp. 3d 1322, 1327 (N.D. Ga. 2019) (holding that "at least with respect to a common law mark, the ACPA requires the

---

[2] The NAF in this case did not follow this finding by WIPO. Instead, it stated that although the threshold for finding rights in a mark under the UDRP is low, state registrations were "sufficient to establish a complainant's rights in that mark for the purposes of [the UDRP]."

11

existence of a mark at the time of registration, which can be established only through actual prior use in commerce").

¶26. Carr references ***Thompson***, a case in which a politician brought a claim against five anonymous defendants for registering a domain name using the term, "dar4ptc," which he claimed was his trademark. ***Id.*** at 1323. Dar4ptc was an acronym that Thompson alleged meant Dar for Peachtree City. ***Id.*** The Georgia district court found that "there is no explicit use requirement related to the time of the domain registration. However, an obvious implication from the text of the statute is that there must be a 'mark' capable of being distinctive at the time of registration." ***Id.*** at 1326. The court then diverged from the language of the ACPA to apply traditional principles of trademark law to support its finding that a use requirement is implicated by the language of the statute because use is required to create a common law trademark. ***Id.***

¶27. This Court declines to follow ***Thompson*** because it is not binding authority and, in this Court's opinion, incorrectly applied traditional principles of trademark law to narrow claims allowed under the ACPA. Carr bases many of his arguments on the traditional principles of trademark infringement, instead of applying cases dealing with anticybersquatting claims under the ACPA. As already mentioned, the ACPA was created to provide a federal solution to the shortcomings of the protections afforded under traditional trademark laws. *See **Sporty's***, 202 F.3d at 495; Altman & Pollack, *supra* ¶ 18, at § 22:40.

¶28. Addressing Carr's use argument, the MLC argues that there is no use requirement for its mark to qualify for protection under the ACPA. The MLC points to ***Sporty's*** as authority

for its claim. *Sporty's*, 202 F.3d at 497. In *Sporty's*, the United States Court of Appeals for the Second Circuit stated that "[a] mark may be distinctive before it has been used — when its fame is nonexistent. By the same token, even a famous mark may be so ordinary, or descriptive as to be notable for its lack of distinctiveness." *Id.* (citing *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 215-26 (2d Cir. 1999), *abrogated on other grounds by Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 427-28, 123 S. Ct. 1115, 155 L. Ed. 2d 1 (2003)). Additionally, the MLC points to the legislative history of the ACPA in which it was expressly contemplated that the ACPA would protect future campaigns and potential athletes from "'dot-con' artists" [3] who registered athletes' names or politician's campaign slogans before such marks became distinctive or famous. 145 Cong. Rec. S14986-03, 1999 WL 1050353, at *S15026, *S15019 (daily ed. Nov. 19, 1999) (statements of Sen. Orrin Hatch) ("a number of cybersquatters have targeted the names of high-school athletes in anticipation that they may some day become famous").

¶29.    Carr argues that the MLC could not have owned a distinctive mark at the time of his registration because he registered his domain name before the MLC was approved by the legislature. Similar arguments have been addressed by several federal courts in cases in which a domain name was registered in anticipation that a mark may become distinctive or famous.    In one such case, Global Marine Incorporated and Santa Fe International Corporation announced a merger agreement on September 3, 2001. *Globalsantafe Corp. v. Globalsantafe.com*, 250 F. Supp. 2d 610, 612 (E.D. Va. 2003). "Less than one day later,

---

[3]This is not a typo.  The speaker of the comment, Senator Orrin Hatch, clearly had a sense of humor.

Jongsun Park registered the domain name <globalsantafe.com> with the Korean registrar Hangang." ***Id.*** at 613. Global Marine and Santa Fe filed a claim under the ACPA for cyberpiracy. ***Id.*** Although both companies had established rights in the marks of their individual names, neither company had yet established rights to the GlobalSantaFe mark. ***Id.*** at 616. The district court found that the registration with the USPTO was pending, but the record evidenced that Jongsun Park registered the domain name in response to the public announcement of the GlobalSantaFe merger. ***Id.*** Additionally, there was no proof of any legitimate or prior use of the domain name by the registrant, so the court affirmed that Park's actions were "in clear violation of the ACPA, and GlobalSantaFe is accordingly entitled to transfer or cancellation of the domain name under § 1125 (a)(2)(D)(i)." ***Id.***

¶30. In the present case, three of Carr's domain names were registered on December 13, 2017, less than a year prior to the formation of the MLC on October 19, 2018. The other two were registered on August 7, 2018, just weeks before the Mississippi Lottery was approved by the governor on August 31, 2018. The MLC has been the topic of much public debate for thirty years. Carr admitted in his complaint that "[t]he possibility of a lottery passing has been a hotly contested and discussed matter for approximately 30 years." By his own admission, Carr knew that the MLC was a politically relevant topic and that he intentionally registered at least sixty variations of domain names using the terms "Mississippi" and "lottery" before the passing of the lottery. The trial court found that "[a] lottery bill was first introduced to the Mississippi Legislature in 1990. Subsequent lottery bills were introduced each year thereafter, until 2018 when the lottery bill was approved and signed by the

14

governor. Carr was admittedly aware of the legislature's effort to establish the lottery leading up to its enactment." The Court agrees with the logic of the *Globalsantafe* court, and as applied to this evidence, it supports the trial court's finding that the MLC had a distinctive or famous mark entitled to protection under the ACPA, despite the fact that the lottery had not yet been approved by the legislature when Carr registered his domain names.

¶31. In a case from a Florida district court, 411 Kitchen Cabinets registered the domain name www.411kitchencabinets.com. But before it obtained a federal trademark to "411 Kitchen Cabinets Vanities & Granite," King of Kitchen & Granite, Inc., a major competitor of 411 Kitchen Cabinets, registered the domain name www.411kitchencabinet.com. *411 Kitchen Cabinets LLC v. King of Kitchen and Granite Inc.*, No. 16-80206-Civ-Rosenburg/Brannon, 2016 WL 7335840, at *1 (S.D. Fla. Oct. 25, 2016). 411 Kitchen filed a claim for cybersquatting under the ACPA against King. *Id.* King argued that 411 Kitchen's mark was not distinctive because King "registered its allegedly infringing domain name nearly three years *before* Plaintiff registered its mark with the Patent and Trademark office." *Id.* at *2. The district court found that "the use of unregistered trademarks may give rise to liability where the marks 'are so associated with plaintiff's goods that the use of the same or similar marks by another company constitutes a false representation that its goods came from the same source.'" *Id.* (quoting *Tartell*, 2013 WL 11971280, at *3).

¶32. The trial court found that Carr's "websites either have no content or content which appear to advertise the lottery." Carr's use of the MLC mark in its domain name gives the impression that Carr was representing the MLC. Screenshots of the domain page in the

15

record show that Carr's landing pages gave information about the lottery and scratch off tickets. The pages also allowed people to enter their contact information in order to "Join the MS Lottery E-Club." Additionally, the domain pages had links to the "Mississippi Lottery Full Site" that would redirect users to Carr's other domain page. One of the domain pages contained the phrase "© 2018 by Mississippi Lottery Corporation" implying it belonged to the MLC. Carr stated that he was using his domain pages to target people who were considering gambling with the intent to counsel them against engaging in gaming activities. This Court agrees with the logic of *411 Kitchen* and finds that the words "Mississippi Lottery" and "Mississippi Lottery Corporation" are so associated with the years of public debate regarding an official Mississippi lottery and the use of the these terms by the MLC that Carr's use of these words (in the manner he used them in his domain names) constituted a false representation that his domain pages were affiliated with the MLC. *See id.*

¶33.    Although Carr argues that the MLC was not yet fully formed so its mark could not be distinctive, the domain pages are evidence that the MLC mark was distinctive. Some federal courts have found that the very act of intentionally copying a mark is evidence of the distinctive nature of the mark. *See Baxter Bailey & Assoc., Inc. v. Powers & Stinson, Inc.*, No. 14-3012, 2016 WL 7497581, at *4 (W.D. Tenn. July 5, 2016) ("Intent is relevant because purposeful copying indicates that the alleged infringer, who has at least as much knowledge as the trier of fact regarding the likelihood of confusion, believes that his copying may divert some business from the senior user." (internal quotation marks omitted) (quoting *Daddy's*

16

*Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 287 (6th Cir. 1997))); *Ballistic Prods., Inc. v. Precision Reloading, Inc.*, No. CIV. 03-2950, 2003 WL 21754816, at *6-7 (D. Minn. July 28, 2003) ("Moreover, '[t]he existence of secondary meaning of a mark may be inferred from evidence of deliberate copying of that mark.'" (alteration in original) (quoting *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 871 (8th Cir. 1994))).

¶34. Additionally, Carr argues that the mark is not distinctive because it is not federally registered. The trial court found that the MLC's mark did not have to be federally registered to qualify for protection under the ACPA. *See Matal*, 137 S. Ct. at 1752 ("Unregistered trademarks may also be entitled to protection under other federal statutes, such as the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)."). But the MLC's mark is now federally registered, and the MLC's federal registration is further evidence of the validity of the mark. If the MLC had federal trademarks prior to Carr's registration of his domain names, the trademarks would satisfy this element of the ACPA claim. *See* 15 U.S.C. § 1125 (d)(1)(A)(ii)(III). Since the MLC marks were not federally registered until after Carr's registration of the domain names, some federal courts, requiring additional evidence, have found that proof of subsequent registration operates as strong evidence of the distinctive nature of the mark. *Zinner v. Olenych*, 108 F. Supp. 3d 369, 386-87 (E.D. Va. 2015) (finding that proof of registration created a presumption that the mark had been valid prior to its time of registration and also at the time of the domain name registration, which was sufficient to create a genuine issue of material fact that could not be resolved on summary

17

judgment). In the present case, the MLC has federal trademark registrations that create a presumption that its mark was distinctive prior to the date of its issuance.

¶35. Carr argues that the MLC mark is generic, which would not entitle it to trademark protection. The MLC argues that even if the MLC's mark is generic, there is no rule under federal or state law that generic marks are not entitled to trademark protection. *See U.S. Pat. & Trademark Off. v. Booking.com B. V.*, 140 S. Ct. 2298, 2307, 207 L. Ed. 2d 738 (2020) ("Whether any given 'generic.com' term is generic, we hold, depends on whether consumers in fact perceive that term as the name of a class or, instead, as a term capable of distinguishing among members of the class."); *Richardson v. Thomas*, 257 So. 2d 877, 879 (Miss. 1972) ("A protectable right in the use for trade purposes of a word in common use may be acquired under the doctrine of secondary meaning." (internal quotation mark omitted) (quoting 52 Am. Jur. *Trademarks, Tradenames, Etc.* § 54 (1944))). The Court finds that the MLC is correct because Carr's argument is unsupported by authority both from the United States Supreme Court and this Court.

¶36. The MLC submitted a list of other state lottery domain names and argues that it proves that nearly every state lottery uses similar domain names to the ones that Carr registered for their respective state lottery web pages. Although not binding on this Court, the MLC also presented other NAF arbitration orders in which state lotteries prevailed in their complaints against domain name registrants and were awarded the transfer of the domain names to avoid consumer confusion and deception.

¶37. The trial court here found that "[i]n sum, the Mississippi Lottery has a 'distinctive or

18

famous mark' entitled to protection under the ACPA and Mississippi law. Mississippi lottery is trademarked with the Mississippi Secretary of State, [then-]pending federal trademark applications, as well as the many years of public debate in the Legislature using the term 'Mississippi Lottery.'" The trial court found that "Carr, in turn, has no protected trademarks in the name Mississippi Lottery." The NAF stated that Carr "is not able to avoid a finding of bad faith simply became he registered the Domain Names before Complainant acquired actual rights in the MISSISSIPPI LOTTERY mark." We find the trial court did not err by finding that the MLC marks were distinctive at the time Carr registered the domain names.

### iii. The Domain Names at issue are registered to Carr.

¶38. Neither party disputes that Carr is registered as the owner of the domain names at issue. This element is satisfied.

### iv. The Domain Names are identical and confusingly similar to the MLC marks.

¶39. The trial court found that because the domain names add ".org," ".com," ".us." or the abbreviation "ms" to the Mississippi Lottery's mark they are confusingly similar. *See E. & J. Gallo*, 129 F. Supp. 2d at 1043 (domain name "ERNESTANDJULIOGALLO.COM" was found to be confusingly similar to the registered trademark "ERNEST & JULIO GALLO" because it was substantially the same as the trademark.).

¶40. Additionally, the MLC presented evidence of actual confusion by the public. An affidavit from Rachel Comeaux, who is an employee for the insurance company HUB International Ltd. was submitted by the MLC. Comeaux used a graphic from Carr's

19

www.mslottery.com webpage in an official proposal package that she sent to the MLC as a pitch for potential lottery employee benefits. Comeaux stated, "[i]t appeared to me that www.mslottery.com was the website for the MLC, and that the Mslottery.com Logo was the logo utilized by the MLC." The MLC also presented two separate occasions when the Mississippi Braves and the Biloxi Shuckers baseball teams used Carr's logo from the website on their advertising pitches.

¶41. Carr does not directly address the similarities of the domain names to the MLC mark. Instead Carr rehashes his argument that his domain names could not be confusingly similar to the MLC mark because the MLC did not have a mark at the time of his registration. For the reasons already stated in the section above, the trial court did not err by finding that Carr's registration and use of the domain names are confusingly similar and identical to the MLC mark, which was distinctive at the time of registration.

### v. Carr registered the domain names with a bad faith intent to profit.

¶42. There are nine statutory factors for consideration of bad faith intent to profit under an ACPA cyberpiracy claim:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
>
> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
>
> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
>
> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).

15 U.S.C. § 1125 (d)(1)(B)(i). Federal courts have found that courts are not limited to the listed statutory factors. *See* 15 U.S.C. § 1125(d)(1)(B)(i) ("a court may consider factors such as but not limited to . . . ."); *N. Light Tech., Inc. v. N. Lights Club*, 236 F.3d 57, 64-65 (1st Cir. 2001); *Sporty's*, 202 F.3d at 498; *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 270 (4th Cir. 2001); *E. & J. Gallo Winery v. Spider Webs Ltd.*, 286 F.3d 270, 277 (5th Cir. 2002); *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 811 (6th Cir. 2004).

¶43. Carr's conduct satisfies a number of these factors. Carr has no intellectual property

21

rights in the domain names. *See* 15 U.S.C. § 1125(d)(1)(B)(i)(I). Carr does not identify himself personally by the domain names or call himself Mississippi Lottery. § 1125(d)(1)(B)(i)(II). Carr's use of the domain names thus far has not been for bona fide offerings of goods or services. § 1125(d)(1)(B)(i)(III). Instead, two of the domain names appear to promote the Mississippi Lottery, and three of the domain names have blank landing pages.

¶44. Under the statute, a court may not find bad faith intent when "the person believed and had reasonable grounds to believe that the use of the domain name was fair use or otherwise lawful." § 1125 (d)(1)(B)(ii). Carr argues that he was not seeking to make a profit but intends to make "legitimate non-commercial and fair use of the domain names." Carr is adamantly opposed to gambling, and he and his family are vocal opponents of gambling and lotteries. Since 2004, Carr and his family have managed a faith-based recovery program "designed to rescue, recover, and restore those with addictive behaviors, including gambling and drugs." For this reason, Carr claims that he registered the domain names to use them "for political commentary, social critique, and personal counseling to individuals deciding whether to gamble on the lottery in Mississippi." Carr argues his use of the domain names as a site for noncommercial use and criticism is protected by the First Amendment. *See TMI, Inc. v. Maxwell*, 368 F.3d 433, 440 (5th Cir. 2004) (defendant's noncommercial website was not actionable cybersquatting because it was used for criticism); *Grosse*, 359 F.3d at 810; *Lampraello v. Falwell*, 420 F.3d 309, 313 (4th Cir. 2005) ("In its two most significant recent amendments to the Lanham Act, the Federal Trademark Dilution Act of 1995 ('FTDA') and

22

the Anticybersquatting Consumer Protection Act of 1999 ('ACPA'), Congress left little doubt that it did not intend for trademark laws to impinge the First Amendment rights of critics and commentators.").

¶45. The trial court rejected Carr's fair use argument. The trial court found that although Carr cited many federal cases in which fair use under the ACPA was found for domain names that were used for noncommercial criticism or political commentary, Carr's websites were not being used for any such purpose. Instead, the court found that "[w]hile Carr does appear sincere in his beliefs, the Court must look to his actions. . . . Carr's actions speak louder than his words. His conduct demonstrates his purpose in registering the domain names was to profit and to prevent Mississippi Lottery from having them."

¶46. The trial court's factual finding was not clearly erroneous. The content on Carr's web pages does not support his claim of fair use. Two of the domain pages appear to advertise and promote the lottery. Images of falling money, scratch-off tickets, and information about the lottery are features of the web pages. The NAF described one of the web pages as "a picture of a happy, exuberant man surrounded by dollar bills floating in the air and the words 'JOIN THE WINNER CIRCLE' written across his chest. Off to the side is the MS LOTTERY graphic with the words 'COMING SOON' printed above it." Additionally, one of the websites contained the phrase "© 2018 by Mississippi Lottery Corporation," implying it belonged to the MLC. Carr stated that he disagreed with the design of the temporary website and has submitted into the record a proposed design that he will upload as soon as he regains access. Nevertheless, Carr admitted that the content was uploaded in September

23

2018, and he allowed the landing pages to remain active for the purpose of acquiring emails. Carr was locked out of his domain names when the MLC filed its complaint with the arbitration board on May 13, 2019. Carr had more than seven months to change the content of his domain pages. The trial court found that, although Carr had ample time prior to arbitration, he had failed to upload content that "at least minimally aligned with critique or counseling services related to the lottery."

¶47. Regarding the three blank web pages, the trial court referenced the United States Court of Appeals for the Fifth Circuit case *E. & J. Gallo Winery*, which followed similar holdings from the United States Courts of Appeal for the Second and Third Circuits that "when a registrant first uses a web site after litigation begins, this undermines any claim that the use was in good faith or was a fair use under the ACPA." *E. & J. Gallo*, 286 F.3d at 276 (citing *Sporty's*, 202 F.3d at 499); *Shields v. Zuccarini*, 254 F.3d 476, 485-86 (3d Cir. 2001). This Court agrees with this logic. In the present case, Carr has made no use of these three domain names.

¶48. Carr argues that the court should have evaluated his future intent for the domain names. But Carr cites no caselaw to support this argument. Carr merely attempts to evade the requirements of the ACPA by submitting an alternative website design. While this Court does not make a generalized finding that future intent is never relevant to an anticybersquatting claim, under these facts, the trial court did not err by finding that future intent was not relevant in this case. We find no error in the trial court's consideration and subsequent rejection of Carr's arguments regarding his First Amendment rights and future

24

intent.

¶49.    Finally, the MLC claims that Carr had a bad faith intent to profit when he offered to sell the domain names to the MLC attorneys.  Carr informed this Court in his brief that the actual contents of the conversation between Bill Smith and him may never be known, but even if he did offer to sell his domain names, it was not in bad faith but an attempt to settle, which is inadmissable under Mississippi Rule of Evidence 408.  Carr cites a case from the United States Court of Appeals for the Ninth Circuit in which the court recognized that "[t]he District Court did draw a distinction between attempting to sell a domain name before litigation commences and doing so in the context of litigation itself."  ***Rearden LLC v. Rearden Com., Inc.***, 683 F.3d 1190, 1221 (9th Cir. 2012).  The court in ***Rearden***, however, did not find the evidence of settlement negotiation to be inadmissible but held that it created a genuine issue of material fact.  ***Id.***  The MLC argues that evidence of an offer to sell the domain names is "highly relevant to the issue of 'bad faith'" and should be admitted.

¶50.    This trial court did not err by considering Carr's communications with the MLC attorneys.  Carr's unsolicited communications with the MLC attorneys regarding the sale of his domain names were prior to the filing of any litigation, making it less likely that Carr was attempting to engage in settlement negotiations.[4]  Several federal courts have found that an offer to sell the domain names proves a core element of the ACPA claim and for this reason is admissible.  *See **Zinner***, 108 F. Supp. 3d at 391 (offer to sell domain names admissible

---

[4] Carr texted Lucien Smith on March 4, 2019, and talked to Bill Smith on April 3, 2019.  Deming spoke with Bill Smith on April 9, 2019.  The NAF claim was filed nearly a month later on May 13, 2019.

because it was not offered "to prove or disprove the validity or amount of a disputed claim" but instead to prove an element at the core of the Plaintiff's claim, i.e., bad faith intent (internal quotation marks omitted) (quoting Fed. R. Evid. 408(a)); *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 786 (8th Cir. 2004) ("A proposal to exchange domain names for valuable consideration is not insignificant in respect to the issue of bad faith intent to profit."). The trial court did not err by considering Carr's statements as evidence of bad faith intent to profit.

¶51. Carr denies that he offered the domain names for sale and argues that the call was staged and fabricated in bad faith to produce evidence to use against him in a UDRP claim. But, importantly, Carr did not directly refute the testimony from Bill Smith that Deming, Carr's attorney, called Bill Smith on Carr's behalf to solicit selling the domain names.[5] Additionally, Bill Smith's testimony was supported by Andress's testimony and notes of his recollection of the conversation. For these reasons, the trial court found that "it is more likely than not that Carr sought out the conversation to discuss the purchase of the websites." Although there was conflicting evidence as to what exactly happened during the conversation, the trial court's factual finding was supported by the evidence.

¶52. Additional evidence of bad faith has been submitted by the MLC. A Facebook page using the same images found on Carr's website was created under the name "Mississippi Lottery." Deming responded to comments on the page giving information regarding the

---

[5]At the hearing, Carr was directly asked by the MLC's attorney if Carr disputed the fact that Deming called Bill Smith on his behalf to discuss the sale of the domain names. Carr stated that he was not on the phone call and "would not attest to what they did talk about or did not talk about."

lottery and telling people to check Carr's website for additional information. Carr stated that he did not know who owned the account and had not attempted to contact Facebook to take down the page. Additionally, Carr's application for registration of a for-profit business under the name "Mississippi Lottery Corporation" is further evidence that Carr was attempting to interfere with the MLC's use of their marks.

¶53. The trial court found that "Carr's conduct taken in *toto* is indicative of 'bad faith' under the ACPA." This Court agrees.

### B. Injunctive relief was necessary to prevent irreparable harm.

¶54. Carr argues that the MLC failed to prove irreparable harm because it has a fully functional website at mslotteryhome.com that it was successfully operating. Additionally, Carr argues that the MLC had reported on June 21, 2021, that the lottery sales were great and exceeded expectations. For these reasons, Carr agues the MLC is not harmed by his ownership of the domain names.

¶55. The trial court did not find Carr's arguments persuasive. The court agreed with the MLC that "there is ample evidence of not only a likelihood of confusion, but actual public confusion that Carr's websites are those of Mississippi Lottery." Relying on Fifth Circuit and Mississippi caselaw on trademark infringement, the trial court found that injunctive relief was necessary to prevent irreparable harm. *See* ***E. & J. Gallo***, 286 F.3d at 280; ***Advanced Med., Inc. v. Advanced Med. Sys., Inc.***, 988 So. 2d 424, 426 (Miss. Ct. App. 2008) (affirming chancellor's grant of injunctive relief to prevent confusion of corporate name). The trial court did not err by determining that the MLC would be irreparably harmed by

27

Carr's continued use of the domain names.

### C. The threatened injury to the MLC outweighs the potential harm to Carr.

¶56. Carr argues that he is being harmed because he does not have access to his accounts and that his First Amendment rights are curtailed. Carr states that once he is allowed to revise his website "it would be impossible that any reasonable member of the buying public" would confuse his website with the MLC. The trial court stated that, based on the facts as they exist, the threatened injury to the MLC outweighed the potential harm to Carr.

¶57. We agree with the trial court. Carr had more than a year from December 13, 2017, the time of his first domain name registration, until May 13, 2019, the time the MLC filed the NAF complaint, to update his website with criticism or political debate that would have entitled him to a fair use defense. Instead, the trial court stated, "Carr failed to use his domain names for any purpose other than to display information that advertised for the Mississippi Lottery." The MLC argues that nothing is preventing Carr from posting his content to other domain names. Additionally, the MLC points out that Carr's website illegally advertises for the lottery under Mississippi Code Section 97-33-33. The trial court did not err by finding that the MLC's "potential loss of goodwill, the ability to promote the lottery and the potential loss of customers" outweighed the potential harm Carr may experience.

### D. The injunction is in the public interest.

¶58. Carr argues that the injunction is against public interest because it silences political and social public debate. The trial court disagreed and found that eliminating confusion as

28

to the domain names best serves the public interest. Pursuant to Mississippi Code Section 27-115-7(1) (Supp. 2022), the MLC is statutorily mandated to administer the lottery "in such a manner that enables the people of the state to benefit from its profits and to ensure the integrity of the lottery." We find that the trial court did not err by finding this element was satisfied in favor of the MLC.

## II. The trial court did not err by consolidating the hearing for a preliminary injunction with a trial on the merits.

¶59. We find no cases on the standard of review for a trial court's consolidation of a hearing with a trial on the merits under Mississippi Rule of Civil Procedure 65(a). Carr contends that the trial court misapplied Rule 65 along with other questions of law and, for this reason, Carr suggests that this Court review the trial court's order de novo. To consolidate the hearing with a trial on the merits, however, was in the trial court's discretion, so we review this decision for an abuse of discretion. Miss. R. Civ. P. 65 (a)(2)

¶60. Carr argues that the trial court improperly consolidated the hearing with a trial on the merits which "bypassed the protections afforded a plaintiff when faced with a Motion for Summary Judgment" and denied Carr a trial by jury. We find Carr's arguments are without merit.

¶61. Both the MLC and Carr moved for preliminary injunction. Contrary to Carr's arguments, no facts or inferences should have been viewed in the light most favorable to either party because this was not a motion for summary judgment. The trial court held a hearing on both the MLC's and Carr's motions for preliminary injunction. At the close of the evidence both parties agreed and/or deferred to the trial court as to the consolidation of

29

the hearing with a trial on the merits under Rule 65. Although both parties acquiesced, under the plain language of the rule it was not necessary for the Court to gain the approval of the parties for consolidation. *See* Miss. Rules Civ. Pro. 65(a)(ii) ("Before or after commencement of the hearing on application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application.").

¶62.    Carr was not entitled to a jury trial on the issue of injunctive relief. The right to a trial by jury is only "guaranteed only in cases in which, at common law, a jury was required." *City of Durant v. Laws Constr. Co., Inc.*, 721 So. 2d 598, 607 (Miss. 1998) (citing *Curtis v. Loether*, 415 U.S. 189, 195, 94 S. Ct. 1005, 39 L. Ed. 2d 260 (1974)). Of course, the legislature may by statute provide for a trial by jury. *See* Miss. R. Civ. P. 38(a) ("The right of trial by jury as declared by the Constitution or any statute of the State of Mississippi shall be preserved to the parties inviolate."). But Carr did not assert common law claims or claims for monetary damages. Instead, Carr only requested injunctive relief for his single claim of reverse domain name hijacking, which is "an equitable remedy[.]" *Germany v. Germany*, 123 So. 3d 423, 434 (Miss. 2013) (citing *Derr Plantation, Inc. v. Swarek*, 14 So. 3d 711 (Miss. 2009))). Circuit courts have the authority to grant injunctive relief. *See* Miss. Code Ann. § 9-1-19 (Rev. 2019); Miss. R. Civ. P. 65(e). The MLC references a Fifth Circuit case that well states the rule that "unless Congress has expressly provided to the contrary, an injunction is an equitable remedy that does not invoke a constitutional right to a jury trial." *Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 193 (5th Cir. 2008) (citing *United States*

*v. Louisiana*, 339 U.S. 699, 706, 70 S. Ct. 914, 94 L. Ed. 1216 (1950), *superseded by statute on other grounds as stated in Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1887, 204 L. Ed. 2d 165 (2019). Additionally, no language in the ACPA guarantees Carr a right to a jury trial. The trial court did not err by consolidating the hearing into a trial on the merits, and Carr was not entitled to a jury trial on the issue of an injunction. Also, Carr made no additional claims, and all remaining claims from the MLC were dismissed.

### III. The trial court did not err by denying Carr's Motion for Leave to File Amended Complaint.

¶63. "Motions for leave to amend a complaint are at the sound discretion of the trial court; the Supreme Court reviews such determinations under an abuse of discretion standard[.]" *Moeller v. Am. Guar. & Liab. Ins. Co.*, 812 So. 2d 953, 961 (Miss. 2002) (quoting *Preferred Risk Mut. Ins. Co. v. Johnson*, 730 So. 2d 574, 579 (Miss. 1998), *overruled on other grounds by Upchurch Plumbing, Inc. v. Greenwood Util. Comm'n*, 964 So. 2d 1100, 1118 (Miss. 2007)). Carr argues many different reasons why the court should have allowed him to amend his complaint. None of Carr's reasons, however, show that the trial court abused its discretion by denying his motion for leave to amend. After the trial court denied Carr equitable relief for his reverse domain name hijacking claim, Carr attempted to amend his complaint to request monetary damages for the reverse domain name hijacking claim. The MLC cites a Fifth Circuit case to support its argument that granting leave to amend the complaint after a ruling on the merits would have been improper. *See Benson v. St. Joseph Reg'l Health Ctr.*, 575 F.3d 542, 550 (5th Cir. 2009) ("Once the entry of judgment has occurred, it is proper to deny leave to amend 'where the party seeking to amend has not

31

clearly established that he could not reasonably have raised the new matter prior to the trial court's merits ruling.'" (quoting *Briddle v. Scott*, 63 F.3d 364, 380 (5th Cir. 1995))). This Court agrees with the MLC and affirms the decision of the trial court.

### IV. The trial court did not err by denying Carr's Motion to Dissolve or Modify Permanent Injunction.

¶64. A chancellor is given wide latitude on a motion to dissolve an injunction. *Giles v. Hengen*, 206 So. 2d 626, 627 (Miss. 1968) ("On motion to dissolve an injunction the chancellor has wide latitude in deciding whether a temporary injunction should be retained or dissolved."). The same logic applies to the circuit court's denial of Carr's motion to dissolve or modify the permanent injunction. On this issue, Carr asks the Court to reference his arguments from the July 22, 2021 hearing. At the hearing Carr rehashed arguments that already had been rejected by the trial court. This Court finds that the trial court did not err by denying Carr's motion to dissolve or modify the permanent injunction.

### CONCLUSION

¶65. Carr has failed to prove that he lawfully registered and used the five domain names at issue in this case under the ACPA. The trial court correctly granted the MLC injunctive relief ordering the transfer of ownership of the five domain names. The trial court did not err by denying Carr's motions that followed his first appeal to this Court. This Court affirms the trial court's decisions.

¶66. **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, BEAM, ISHEE AND GRIFFIS, JJ., CONCUR.**

32